IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 22-cv-01960-CNS-KAS

MICAH KIMBALL,

      Plaintiff,

v.

OFFICER JAMI SISNEROS and
JOHN MEONI,

      Defendants.

---

## ORDER

---

In September 2019, Plaintiff Micah Kimball and Michelle Jacobson were engaged and living together in Denver. On September 27, 2019, Michelle Jacobson died of a gunshot wound to her head. Plaintiff was charged with first-degree murder and unlawful imprisonment, tried on the charges in the Denver District Court, and after two full days of deliberation, the jury acquitted him. He then filed this lawsuit, alleging that Defendants John Meoni and Jami Sisneros, both Denver Police Department (DPD) detectives, withheld exculpatory evidence from the prosecutor, his defense attorneys, and the Denver District court. He brings malicious-prosecutions claims under federal and state law.

Defendants now move for summary judgment on Plaintiff's malicious-prosecution claims. ECF No. 111. Plaintiff responded in opposition, ECF No. 130, and Defendants

replied, ECF No. 137. For the reasons explained below, the Court GRANTS Defendants'
motion.

## I.    FACTUAL BACKGROUND[1]

### A.    Plaintiff and Ms. Jacobson's Relationship

In 2019, Plaintiff and Ms. Jacobson lived together at Plaintiff's house and were
engaged. ECF No. 111, ¶ 1. Ms. Jacobson "enjoyed guns" and had a concealed carry
permit. *Id.*, ¶ 2. She knew how to handle, rack, and fire a handgun. *Id.* Plaintiff was a
hunter and owned guns. *Id.*, ¶ 3. He kept a handgun in a bedroom nightstand drawer. *Id.*

### B.    Ms. Jacobson's Death

On September 26, 2019, Plaintiff and Ms. Jacobson were at a bar drinking,
networking, and meeting with friends. *Id.*, ¶ 4. After 7:00 p.m., Plaintiff wanted to go home
but Ms. Jacobson did not. *Id.* Frustrated, he left but she stayed. *Id.* During the
approximately next two hours, Plaintiff called her 14 times, left four voicemails, and sent
nine text messages. *Id.*, ¶ 5. Some messages expressed concern, and others said, "wow";
"I guess I was the idiot that believed in us. What a ride."; "That is the 4th time you lied to
me tonight. Want to go for a 5th???"; "This sucks . . . you said you were on your way
home on the call an hour ago . . . don't know what to believe anymore"; "Respect,
priorities, look up both of those fucking words . . ." ; "Hey baby. Just trying to figure out

---

[1] The Court draws the background facts largely from Defendants' 63 undisputed material facts. ECF No.
111 at 1–10. Plaintiff admits 49 of these facts, and "admits in part" the other 14. ECF No. 130 at 1–4. The
Court draws additional background facts from Plaintiff's statements of additional disputed facts. ECF No.
130 at 4–13. Defendants likewise admit many of Plaintiff's additional facts. Where applicable, the Court
notes the facts that the parties dispute. Whether the Court draws the facts from Plaintiff's or Defendants'
briefs, it construes the factual record and reasonable inference in the light most favorable to Plaintiff. *Self
v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

when you're going to be home and who baby is and where home is. Cause you gave up on both of them . . . Whatever." *Id.*, ¶ 6.

Plaintiff believed that Ms. Jacobson was flirting with other men, as she "had before." *Id.*, ¶ 7. Ms. Jacobson returned home intoxicated at about 11:18 p.m., removed her shoes, and cried. *Id.*, ¶ 8. When she tried to go inside, she said, "Really? You locked me out." *Id.* At or around 11:25 p.m., Plaintiff exited the house onto the front porch and said, "Hey are your shoes with your panties?" and went back inside. *Id.*

At 11:26 p.m., Ms. Jacobson broke a window. *Id.*, ¶ 9. Plaintiff returned to the front porch and asked, "You all right?" She answered, "Do you want me to crawl through the window?" *Id.* He began filming her with his phone and said, "What did you say? What just happened?" *Id.* She tried to swat the phone, and he said, "I hope you had fun tonight." *Id.* At 11:28 p.m., Plaintiff said she was going to pay for the window and, two minutes later he said, "I'm pretty sure you spent the night drinking and fucking." *Id.* After she kicked the door several times, at 11:32 p.m., he said, "Dumb-ass. I don't want to have to call the cops, but . . . ." *Id.* She stayed outside, banging and kicking doors. *Id.*

Ms. Jacobson managed to enter the basement of the house around11:55 p.m. and changed into a jumpsuit. *Id.*, ¶ 13. At 12:02 a.m., Plaintiff left Ms. Jacobson a voicemail saying, "Hey, I hope you came as well with whoever the fuck you fucked tonight. Um, as well as you did when you got fingered in the my [sic] backyard, with the masseuse. I loved watching that. You're such a fucking (inaudible) person. (inaudible) Bye." *Id.*, ¶ 14.

At 12:03 a.m., Ms. Jacobson left the basement and went back outside, apparently back to the front porch. *Id.*, ¶ 15. About 12:06 a.m., Ms. Jacobson reentered the house

through the front door. *Id.*, ¶ 17. After she entered, Plaintiff slammed the door with enough force that it bounced open. *Id.*

At some point over the next few minutes, Ms. Jacobson was shot in the head. At 12:09 a.m., Plaintiff entered the bedroom with his cellphone video camera and light on, recording. *Id.*, ¶ 19. Ms. Jacobson was on her back on the bed. *Id.* Her arms were bent, and her hands rested on her torso. *Id.* A handgun was on her stomach, and the muzzle was pointed at her head. *Id.*

Two minutes later, at 12:11 a.m., Plaintiff called 911. *Id.*, ¶ 20. He told the operator, "We were playing with a gun and . . . and it went off . . . ." *Id.* The operator asked, "You were playing with a gun . . . and it went off?" *Id.* He responded, "Yes, yes, yes." *Id.* Just over a minute later he said, "I didn't even squeeze the trigger." *Id.*[2] He then said that he did not know what happened, he was in the other room, and she shot herself "by her own finger." *Id.* The operator asked Plaintiff, "who had the gun when it went off?," and he said, "I don't know." *Id.* He also said he was "in the other room" and heard a shot. *Id.* He did not know if Ms. Jacobson was shot or bleeding. *Id.* When the operator asked where the gun was, he said that it was in her left hand. *Id.*

About 7:15 minutes into the 911 call, Plaintiff saw police outside of his house. *Id.* At 7:50 minutes, he yelled for them to break the door. *Id.* A few seconds later, the operator asked and started "begging" him to unlock the door. *Id.* She asked him to unlock the door eight times. *Id.* He repeated, "I can't" but finally unlocked it. *Id.*

---

[2] Plaintiff argues that that the transcript states that he said, "I can't even see—squeeze the trigger." ECF No. 130, ¶ 20 (mistakenly labeled ¶ 21). But in his deposition, he agreed that he likely said, "I didn't even squeeze the trigger." ECF No. 111-1 at 224:1–8.

### C.   Police Investigation

#### i.   Police Response to 911 Calls

911 received several calls the evening of September 26 and the early morning of September 27, 2019. Rebekah O'Neill lived next door to Plaintiff. *Id.*, ¶ 10. At 11:50 p.m., she heard a loud noise coming from Plaintiff's house. *Id.* Ms. O'Neill called 911. *Id.*, ¶ 11. She told the operator that her neighbor "locked his girlfriend into the shed and she's screaming for help . . . [a]nd she's crying in pain." *Id.* Ms. O'Neill saw Plaintiff walking in the yard but said she could only hear Ms. Jacobson. *Id.* Ms. O'Neill said this was not the first fight between the two. *Id.*, ¶ 12. At 12:04 a.m., Ms. O'Neill reported that Plaintiff was inside yelling, and Ms. Jacobson was yelling for neighbors to call 911. *Id.*, ¶ 16. Ms. O'Neill also reported hearing Ms. Jacobson banging on something and Plaintiff "thrashing around, throwing stuff." *Id.* Ms. O'Neill spoke to the 911 operator for 21 minutes. *Id.*, ¶ 18. Between 12:06 a.m. and 12:08 a.m., Ms. O'Neill said she heard a gate slam before things went quiet. *Id.*

At least five others also called 911 that night. E. Ma was with B. Mercier when they called police to report a disturbance at Plaintiff's home. *Id.*, ¶ 22. They said they saw a tall white man and heard laughing, glass shattering, shouting, and crying/moaning. *Id.* Mercier stated that, around 12:11 a.m., she saw a man with a handgun in the alley by Plaintiff's house. *Id.* P. Coster told police that he woke up around 11:30 p.m. to a woman screaming. *Id.*, ¶ 23. He heard crying, shouting, and saw a man pacing outside by Plaintiff's garage. *Id.* M. Maly reported a domestic dispute, including sounds of fighting. *Id.* K. Svendsen, who reported knowing the couple, said she heard fighting, arguing, and

then a "crushing" sound. *Id.* Svendsen also said that Plaintiff and Ms. Jacobson tend to fight a lot when they drink. *Id.*

Police officers responded to the 911 calls. *Id.*, ¶ 24. The officers cleared Plaintiff's basement and shed. *Id.* Plaintiff exited the house, and the responding officers detained and handcuffed him. *Id.* He smelled of alcohol and had blood on his hands. *Id.* Officers put bags on his hands to preserve any gunshot residue (GSR) and transported Plaintiff to the police station to be interviewed. *Id.*

Police officers found Ms. Jacobson in the bedroom with a handgun by her left hand; the muzzle was pointing toward her feet. *Id.*, ¶ 25. Authorities transported her to the hospital, where she was declared deceased. *Id.* The bed sheets and pillows were bloody, and there was directional blood spatter on the wall behind the bed and headboard. *Id.*, ¶ 26. Police observed water in the bathroom sink near the bedroom. *Id.*, ¶ 27.[3]

Detectives Meoni and Sisneros investigated the shooting. *Id.*, ¶ 28. Detective Meoni conducted interviews at the police headquarters, and Detective Sisneros oversaw the scene. *Id.* Because Detective Sisneros had to take her child to the doctor, another detective replaced her on the morning of the incident. *Id.*, ¶ 27. Detective Meoni was the primary investigator on the case until he retired in January 2020, at which point Detective Sisneros assumed that role. ECF No. 130, ¶ 9 (Plaintiff's statement of additional disputed facts).

---

[3] Plaintiff admits this fact in part, explaining that the officers did not contemporaneously note water in the sink—"even assuming there was any; in the photo it looks hardly wet." ECF No. 13, ¶ 27. Defendants argue that this response is improper argument, as the photograph of the sink undisputably shows it is wet. ECF No. 137 at 1. The Court agrees with Defendants. In its review of evidence (i.e., the picture of the sink), no reasonable jury could conclude that the sink was dry. ECF No. 111-16 (photograph of sink).

At the scene, Detective Meoni asked one of the crime scene investigators (CSIs), Ross Benik, to put scale tape along the wall and take photographs. *Id.*, ¶ 6. Mr. Benik interpreted this request as a request for bloodstain documentation. *Id.* Because Mr. Benik was not qualified to do a blood spatter analysis (BPA) or bloodstain documentation, he called DPD Crime Lab Deputy Director Angela Deadmond to inform her of the request. *Id.*, ¶¶ 6, 13. She directed him to ask the detectives on scene whether she should respond to the scene to complete a BPA. *Id.*, ¶ 6. DPD Detective Denison told Mr. Benik that they did not need a BPA, and they only needed "good pictures." *Id.*, ¶ 7. Mr. Benik continued to feel concerned that a BPA was needed, and he again called Ms. Deadmond. *Id.* Ms. Deadmon again directed him to consult with DPD, who in turn confirmed that there was no need to do a BPA. *Id.* Detective Denison did not recall that Mr. Benik asked him whether Ms. Deadmond should perform a BPA, but he testified that had he been asked, he would have referred Mr. Benik to the lead detective on the case, Detective Meoni. *Id.*, ¶ 8.

CSIs took photos of the inside and outside of the residence, and Mr. Benik also did a FARO scan of the bedroom. *Id.*, ¶ 10. A FARO is a device that captures thousands of data points that later allows for the recreation of a 3D model of the scene, including "very accurate" measurements of where Ms. Jacobson was positioned when she was shot. *Id.*

After 1:00 a.m. on September 27, about an hour after the fatal shot, Ms. O'Neill made a signed, handwritten statement to police at her house. ECF No. 111, ¶ 29. She stated that she heard screaming and yelling, saw Plaintiff walk to a shed in the yard, saw

7

him pacing in the yard, heard Ms. Jacobson scream "help," "ouch," "you['re] hurting me," "please stop," and bang loudly. *Id.* She said that she never saw Ms. Jacobson but heard her "crying, sobbing, for help." *Id.* Ms. O'Neill said that after calling 911, she heard Ms. Jacobson yell "call 911 Rebekah [O'Neill], Mike, Ann, anyone!" *Id.* At the time, she thought Ms. Jacobson was locked in the shed. *Id.* She said that she heard this type of fighting "often," she heard yelling "all the time," Ms. Jacobson had told her that Plaintiff once locked her in the basement with no phone, and Ms. Jacobson had said that Plaintiff has mental health issues. *Id.* 30. Detective Meoni took another statement from Ms. O'Neill at headquarters. *Id.*, ¶ 30.

Detective Meoni also took a voluntary statement from Plaintiff at 4:00 a.m. on September 27. *Id.*, ¶ 31. Plaintiff said that he had a "fantastic" relationship with Ms. Jacobson but argued with her that day, including when she got home from the bar. *Id.* He denied thinking that she was cheating on him. *Id.* He said that she pulled a gun on him and started to point it at him; he ran to the kitchen; and then he heard a shot. *Id.* He returned to the bedroom, saw her lying motionless in blood, attempted lifesaving measures, and "laid on her and caressed her." ECF No. 130, ¶ 1. He said that she was right-handed, and that he did not move her body or the gun. ECF No. 111, ¶ 30. He also denied that Ms. Jacobson had been locked in the shed and repeatedly denied shooting her. ECF No. 130, ¶ 1.

Plaintiff admitted in his deposition in this civil case that his statement to Detective Meoni contained certain inconsistencies as compared to his 911 call about how Ms. Jacobson was shot, the messages that he left Ms. Jacobson that night about his suspicion

that she was cheating, and about the gun's location and whether he moved it. ECF No. 111, ¶ 32. Plaintiff also admitted during his deposition to moving the gun but not telling the police. *Id.*, ¶ 33.

ii.    *Forensic Testing*

Plaintiff's and Ms. Jacobson's hands, shirt, and shorts were tested for GSR. ECF No. 111, ¶ 38. Technicians found GSR on Plaintiff's shirt and shorts but not his hands. *Id.* GSR was found on Ms. Jacobson's hands, and the bags they were wrapped in. *Id.*

On October 14, 2019, the Denver Crime Lab reported that there was no GSR on Plaintiff's hands and face. ECF No. 130, ¶ 15. There was blood on both of Plaintiff's hands when he was arrested, but it was not high impact blood spatter. *Id.*, ¶ 16. No one from DPD ordered the CSIs "to determine if there was blood or GSR in . . . the sinks" at the house, even though DPD controlled the scene for approximately a month. *Id.*, ¶ 17. The CSIs photographed the sink because it was a routine part of documenting any crime scene. *Id.* This is important because gun shots cause blood spatter, and it dries quickly, can flake off, and can be washed off with soap and water. *Id.*, ¶ 34. However, CSIs can detect the presence of blood after visible blood is washed off. *Id.*; ECF No. 130, ¶ 34.

The parties agree that on October 22 and 24, 2019, the Crime Lab reported that the GSR test on Plaintiff's shorts and shirt revealed the presence of particles of gunshot primer residue. ECF No. 130, ¶ 19. The report explained that the particles could have resulted from possible incidental contact with Ms. Jacobson while rendering aid, from being exposed to GSR when walking into the bedroom after Ms. Jacobson shot herself, or from contact with armed police officers. *Id.* There was one particle of GSR each on the

front of Plaintiff's shorts, the back of his shorts, his back collar, and the back of his shirt,

but no GSR was found on the front of his shirt or the sleeves. *Id.*, ¶ 20. On October 22,

2019, the Crime Lab reported the presence of GSR on Ms. Jacobson's hands, face, and

GSR bags. *Id.*, ¶ 21.

Technicians also tested the gun for DNA evidence. On April 22, 2020, the Crime

Lab reported that there was no DNA matching Plaintiff's DNA on the trigger or barrel of

the gun, and Plaintiff could not be included or excluded as a contributor to DNA on the

grip. ECF No. 130, ¶ 23. DNA from the trigger, grip, and barrel matched Ms. Jacobson's

DNA. *Id.*

### iii.   *DPD Crime Lab Deputy Director Angela Deadmond's Opinion*

On September 30, 2019, Ms. Deadmond asked Detective Meoni whether he was

sure that he did not want a BPA. ECF No. 130, ¶ 11. He repeated that the photos were

good enough. *Id.* She testified that, had she gone to the scene, she would have attempted

to locate the gunshot's point of origin. *Id.* She further testified that the photos were "not

ideal" for BPA because they did not include "scaled photographs of the different stains

throughout the scene," nor "close-up photographs of individual stains throughout the

scene." *Id.*

On October 3, 2019, Ms. Deadmond examined Plaintiff's clothing for blood spatter

consistent with a high impact incident such as shooting someone. *Id.*, ¶ 14. She reported

that no such blood spatter was found, thus concluding that the clothing was not near the

gunshot. *Id.* Ms. Deadmond rejected the theory that an intermediate object could have

been between Plaintiff and the gunshot to explain the lack of spatter. *Id.*

Ms. Deadmond believes that Ms. Jacobson committed suicide. *Id.*, ¶ 46. She believes that Ms. Jacobson held the gun with her right thumb on the trigger and the grip pointed away from her and braced the gun by holding the barrel with her left hand. *Id.* When the gun discharged, Ms. Jacobson's arms were in front of her, and her elbows were pulled towards each other, "[c]ontracting her pectorals[.]" *Id.* After Ms. Deadmond reviewed the evidence, including the crime scene photos, autopsy photos captured by the crime scene unit, video of the crime scene, FARO scans, measurements, laboratory analysis conclusions, and crime scene unit reports (including her own regarding blood spatter on Plaintiff's clothes), she concluded that Ms. Jacobson's gunshot wound was self-inflicted, and no other hypothesis, such as homicide, was possible. ECF No. 130, ¶ 24. On October 18, 2019, Ms. Deadmond told Detective Meoni that, "based on reviewing . . . Kimball's clothing, the crime scene photographs, the crime scene video, and the measurements from the FARO, [she did] not believe anyone other than [Ms. Jacobson] could have pulled the trigger." ECF No. 130, ¶ 25.

Ms. Deadmond did not receive or review any other evidence, never reviewed photos of Ms. Jacobson's arms, hands, or clothing, and never conducted a full BPA. ECF No. 111, ¶ 45. She later reviewed a report prepared by Plaintiff's retained expert and agreed with portions within the scope of her expertise. *Id.* She also testified that "a full blood stain analysis could not be performed based on the quality of photographs in addition to the lack of FARO scans in the bedroom." *Id.* Besides examining Plaintiff's clothing, Ms. Deadmond looked at photos and 3D scans of the scene. ECF No. 111, ¶ 42. She noted problems with the photos, scans, and packaging of his clothing. *Id.*

On June 24, 2020, DA Cohen asked Ms. Deadmond to review a report written by a crime scene reconstruction and BPA expert, Dan Gilliam, hired by Plaintiff's defense counsel. *Id.*, ¶ 27. Ms. Deadmond spoke with DA Cohen on June 30 and told him that she agreed with Mr. Gilliam's BPA conclusions, including about the positioning of the weapon and Ms. Jacobson's body when the trigger was pulled. *Id.* Ms. Deadmond also told him that she had disclosed to Detective Meoni that the evidence "did not comport with the theory of homicide." *Id.*

The following month, on July 22, 2020, Ms. Deadmond spoke with Detective Sisneros and told her that nothing "would support anything other than a self-inflicted gunshot wound." *Id.*, ¶ 29.

iv.    *Autopsy Report*

On October 16, 2019, an autopsy report, prepared by Dr. Dawn Holmes, ruled the manner of death "undetermined" but confirmed that Ms. Jacobson died from a gunshot to the top of her head. *Id.*, ¶ 34; ECF No. 111, ¶ 41. The autopsy identified bruises, some partially healed, on numerous parts of her body, including on the tops of her thighs. ECF No. 111, ¶ 41. It also showed that Ms. Jacobson had a .271 blood alcohol content (BAC) and was under the influence of other substances at the time of her death. ECF No. 130, ¶ 39.

In the note explaining why she "strongly considered" homicide as a possibility, Dr. Holmes stated that she considered "the circumstances surrounding the decedent's death, including a reported domestic dispute with the decedent 'yelling' for a neighbor(s) to summon authorities, the unconventional location of the gunshot wound of entrance and

its overall wound trajectory, the decedent's reported right hand dominance, and the location of the gun when the decedent was found . . . ." ECF No. 137, ¶ 40. Plaintiff faults this finding because the video he took on his phone immediately following the shooting showed that initially the gun was on Ms. Jacobson's stomach on her right side with her right-hand fingers near or on the trigger guard. ECF No. 130, ¶ 40. Detective Meoni conceded in his deposition that, because the gun was actually on Ms. Jacobson's right side, that fact supported suicide more than it supported homicide. *Id.*, ¶ 41. Plaintiff also notes that Defendants did not provide Dr. Holmes with GSR testing, any BPA regarding Plaintiff's clothes, or the DNA testing of the gun. *Id.*, ¶ 42.

On November 6, 2019, defense counsel emailed DA Cohen asking for an "[u]pdate on the Autopsy Report." *Id.*, ¶ 35. The next day, DA Cohen emailed defense counsel that Detectives Meoni and Sisneros told him that the "[a]utopsy report [was] not completed yet," and [i]t usually takes about 6 to 8 weeks for toxicology to come back." *Id.*

  *v. Additional Evidence*

Between Ms. Jacobson's death and October 4, 2019, detectives spoke with more of Plaintiff's and Ms. Jacobson's acquaintances. ECF No. 130, ¶ 47. Seven reported "fighting" between them; four said that Ms. Jacobson told them that Plaintiff was "jealous"; two said they witnessed him being "verbally abusive"; two saw bruises on her; and two said that Ms. Jacobson told them that Plaintiff was "crazy." *Id*. One of those acquaintances said the relationship was "volatile" and had been worried for Ms. Jacobson's safety. *Id.*, ¶ 48. Another said that Plaintiff was "controlling," and that they had a "toxic" relationship. *Id*.

One friend told Detective Meoni that Ms. Jacobson had said Plaintiff was crazy, had kicked her out of the bed resulting in bruises on her arms, had complained about her spending, and would get drunk and angrily pace in the yard. *Id.*, ¶ 49. She said things were "escalating." *Id.* That friend's husband told Detective Meoni that he once saw Plaintiff be "very verbally abusive" to Ms. Jacobson, causing him to "shut it down." *Id.*, ¶ 50. He also said that Ms. Jacobson once stayed with them because Plaintiff went "berserk," throwing her things out and locking her out of the house. *Id.* Each witness asked denied that Ms. Jacobson was suicidal. *Id.*, ¶ 52. However, on August 28, 2019, Detective Meoni learned that Ms. Jacobson texted Plaintiff, stating: "I really need to find a psychologist. I'm not okay. I am extremely depressed. I don't want to be dumping my problems on my mom or my friends." ECF No. 130, ¶ 4.

And on October 2, 2019, Detective Meoni obtained a warrant to search Plaintiff's cellphone. ECF No. 111, ¶ 53. He found videos, including one of Ms. Jacobson on the bed. *Id.* Investigators later found messages showing other arguments, including a February 2019 text message from Plaintiff where he said, "I witnessed how 'empty' you are tonight. Have fun asking people to fill your [***]hole in front of your fiancé in the future." *Id.*, ¶ 54.

### D.    Plaintiff's State Prosecution and Acquittal

On September 27, 2019, at 9:50 a.m., a criminal case was opened in Denver County Court. *Id.*, ¶ 55. DPD officers arrested Plaintiff without a warrant, so Detective Meoni, after consulting with a prosecutor, prepared and submitted a probable cause statement (PC Statement). *Id.* The PC Statement included details from the 911 calls, Ms.

O'Neill's statements, locations of the wound and gun, that Ms. Jacobson was right handed, and Plaintiff's inconsistent statements. *Id.*, ¶ 56. At 10:30 a.m. the next day, Plaintiff had his first advisement. *Id.* The Denver County Court judge reviewed the PC Statement and found that "PROBABLE CAUSE EXISTED AT THE TIME OF THE ARREST/CITATION-for F1[.]" *Id.*

On October 1, 2019, the prosecution filed formal charges in district court and charged Plaintiff with first-degree murder and false imprisonment. *Id.*, ¶ 57. Although Detective Sisneros relayed information obtained during the investigation to Detective Meoni, Detective Sisneros did not participate in any decisions to prepare or submit the PC Statement or formally charge Plaintiff, and Detective Sisneros did not testify at Plaintiff's preliminary hearing on December 3, 2019. *Id.*, ¶ 58; *see also* ECF No. 130-11 (preliminary hearing transcript). On December 3, 2019, Denver District Judge Jay S. Grant determined that there was probable cause for the murder charge. *Id.*, ¶ 60.

DA Cohen tried Plaintiff's case. ECF No. 111, ¶ 59. He did so despite an October 19, 2019 email from Detective Meoni in which he told DA Cohen that "[DPD did not] have any concrete evidence that Kimball shot her, other than his lies [and] weird behavior." ECF No. 130, ¶ 46.[4] Detective Meoni specifically mentioned that the lab testing for blood and GSR on Plaintiff's shirt and the GSR testing of his hands, face, and scalp came back negative, and Detective Meoni "doubt[ed] he changed his clothes" after the gunshot. *Id.* Still, DA Cohen believed that probable cause supported the charges and "ultimately

---

[4] Plaintiff's Statement of Additional Disputed Facts uses "lies *or* weird behavior," but Detective Meoni used "lies *and* weird behavior" in his email to DA Cohen. ECF No. 130-37.

[made] the decision of what charges [went] to trial." ECF No. 111, ¶ 59. He testified during his February 26, 2024 deposition that he still believes that Plaintiff murdered Ms. Jacobson. *Id*.

DA Cohen did not disclose Detective Meoni's October 19, 2019 email, but Plaintiff's defense team discovered it and moved for sanctions. *Id.*, ¶ 61. After a hearing on July 27, 2020, Judge Grant found that the prosecution improperly failed to disclose *Brady* evidence, but he nonetheless found that this email, and Ms. Deadmond's opinion, did not negate probable cause. *Id.*, ¶¶ 61–62.

Plaintiff's case proceeded to trial in August 2020. *Id.*, ¶ 63. Ms. Deadmond testified at trial. ECF No. 130, ¶ 31. DA Cohen did not present any testimony at trial from an expert CSI that contradicted Ms. Deadmond's opinion. *Id.*, ¶ 32. Plaintiff's expert, Mr. Gilliam, concluded in his report that, based on the bloodstains and measurements from the scene, it "would [have] be[en] impossible" for Plaintiff to have shot Ms. Jacobson without "becoming bloodstained by the backspatter." *Id.*, ¶ 33. He also opined that Ms. Jacobson shooting herself by holding the gun in two hands was "a much more probable scenario than another shooter shooting her in the top of the head." *Id*.

After two full days of deliberation, the jury found Plaintiff not guilty. *Id.*, ¶ 63.

## II.    LEGAL STANDARDS

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir.

2003) (internal quotations and citation omitted); Fed. R. Civ. P. 56. The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.    ANALYSIS & ORDER

The parties agree that Plaintiff's state and federal malicious-prosecution claims share the same elements. To prevail on these claims, Plaintiff must establish that (1) Defendants caused Plaintiff's "continued confinement or prosecution"; (2) the original criminal proceeding terminated in Plaintiff's favor; (3) no probable cause supported the confinement or prosecution; (4) Defendants "acted maliciously;" and (5) Plaintiff "sustained damages." *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023); *Hewitt v. Rice*, 154 P.3d 408, 411 (Colo. 2007) (setting forth the same five elements). Defendants argue that Plaintiff cannot prove the first, third, and fourth elements. The Court first addresses whether probable cause supported Plaintiff's continued prosecution before turning to the other two elements.

**A.    Whether Probable Cause Supported Plaintiff's Continued Prosecution**

"Officers must have probable cause to initiate a . . . prosecution under the Fourth Amendment." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). This is not a "precise quantum of evidence," and it does not "require the suspect's guilt to be more likely true than false." Rather, the Tenth Circuit has said that the relevant question is whether a "substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Id.* (internal citation and quotations omitted). Probable cause, however, "is not a high bar." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

Plaintiff does not argue that his initial arrest was unsupported by probable cause. Nor does Plaintiff argue that probable cause was lacking when the government initiated formal proceedings against him in state court. Instead, he argues that Defendants' conduct throughout the criminal case, including the concealment of exculpatory evidence and failure to conduct a thorough investigation, demonstrated a lack of probable cause for his continued prosecution. ECF No. 130 at 16. The Court does not agree.

To be sure, as a criminal prosecution proceeds, new information can "dissipate probable cause." *Hinkle*, 962 F.3d at 1221 (collecting caselaw, including *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("A person . . . must be released from arrest, if previously established probable cause has dissipated.")). The Court finds it helpful to walk through the initial evidence that established probable cause, and then

analyze whether the later-developed evidence that Plaintiff points to dissipated probable cause.

i.  *Probable Cause at the Time of Arrest and Initiation of Criminal Case*

Defendants point to several pieces of evidence that established probable cause on the day of Ms. Jacobson's death. ECF No. 111 at 13–19. First, they cite to the numerous 911 calls in the hour before her death. *Id.*, ¶¶ 11–12, 22–23. Defendants explain that multiple 911 callers—at least six callers—reported a domestic dispute at Plaintiff's house; one heard Ms. Jacobson yelling for help and saying that she was being hurt; one caller reported that Plaintiff had mental health problems, had fought with Ms. Jacobson before, and had previously locked her up somewhere; another witness possibly saw a man matching Plaintiff's description with a gun in the alley behind Plaintiff's house; another caller said that Plaintiff and Ms. Jacobson fought a lot. *Id.* The Court agrees that these calls strongly suggest that Ms. Jacobson may have been shot during a domestic violence incident, supporting probable cause for Plaintiff's arrest.

Second, Defendants argue that a reasonable officer could have believed that Plaintiff's statements supported probable cause. *Id.* at 15. They note that Plaintiff told the 911 operator that Ms. Jacobson was shot while they were playing with a gun and that he "didn't even squeeze the trigger." *Id.*, ¶ 20. He then changed his story several hours later to say that he was not in the room when the gun discharged. *Id.* The Court agrees that both his initial statement and his changed story are highly questionable at best. The first statement suggests that he was in the room when the gun fired. And the second statement suggests that he was trying to cover something up.

And third, at the time of his arrest, Defendant's pointed to the gun's position and Ms. Jacobson's entrance wound as supportive of probable cause. *Id.* at 15–16. They explained that Ms. Jacobson was right handed and likely would have used her right hand to shoot herself. *Id.*, ¶ 31. But the gun was found by her left hand. *Id.*, ¶ 56; ECF No. 111-31 (stating in the PC Statement that Plaintiff repeatedly denied shooting her but pointing to the above evidence, including the body-worn camera of the first officers on scene showing the "handgun lying on her open left hand despite her being right handed").

For these three broad reasons, the Court agrees with the parties that initially, there was a "substantial probability" that Plaintiff shot Ms. Jacobson, and thus, there was probable cause to charge him with homicide. *Stonecipher*, 759 F.3d at 1141.

   ii.  *Judicial Officers' Initial Decisions That Probable Cause Existed*

Detective Meoni outlined the three points above in his PC Statement. ECF No. 111-31. The next day, on September 28, 2019, Plaintiff had his first advisement. ECF No. 111, ¶ 55. The Denver County Court judge reviewed Detective Meoni's statement and found that "probable cause existed at the time of the arrest/citation." *Id.*; ECF No. 111-30 (County Court Minute Entries and Criminal Information).

During the December 3, 2019 preliminary hearing before the Denver District Court, Judge Grant considered the above evidence and found that "there's probable cause for first degree murder and it will be bound over." ECF No. 111-33 at 3; ECF No. 111-31 (PC Statement prepared by Detective Meoni).

### iii. Later-Developed Evidence

As previously noted, Plaintiff does not argue that his initial arrest was unsupported by probable cause. Plaintiff instead argues that probable cause dissipated within weeks of his arrest, pointing to (i) results of forensic testing such as the GSR that did not support homicide, (ii) the autopsy report that said the manner of death was "undetermined," (iii) that the gun was near Ms. Jacobson's right hand immediately after the shooting,[5] (iv) that Plaintiff's clothes contained no high impact blood spatter, and (v) Ms. Deadmond's opinion that the bloodstain evidence did not support homicide. ECF No. 130 at 17. The Court is not persuaded.

Judge Grant considered this later-developed evidence that Plaintiff argues dissipated probable cause the month before Plaintiff's murder trial began and *reaffirmed that probable cause exists*. ECF No. 111-35. There, Plaintiff's defense team moved for sanctions because the government failed to timely produce to the defense, among others, the autopsy report and two arguably exculpatory statements. ECF No. 111-34 (Motion for Sanctions for *Brady* Violations, Criminal Procedure Rule 16 Violations, and Outrageous Governmental Conduct). Judge Grant heard oral argument on the motion and then addressed the two statements in a written order. ECF No. 111-35. The first statement was an email exchange between Detective Meoni to DA Cohen on October 18, 2019, in which Detective Meoni stated that the

> lab testing for blood and GSR on Kimball's shirt and GSR kit all came back negative. That means they were unable to determine if Kimball was in an environment where a gun was

---

[5] The Court reiterates that Plaintiff himself told the 911 operator that the gun was in her left hand. ECF No. 111, ¶ 20.

> fired. I doubt he changed his clothes. We don't have any
> concrete evidence that Kimball shot her, other than his lies
> and weird behavior.

ECF No. 130-37. The District Court found that this email was, at the least, impeachment

evidence that should have been produced earlier. ECF No. 111-35.

The second statement was Ms. Deadmond's opinion that the evidence she

reviewed did not support a theory of homicide. *Id.* Judge Grant found that Ms. Deadmond

was a "high-ranking expert in the Denver Police Department Crime Lab who told

detectives just weeks after the death of Ms. Jacobson that the evidence did not support

the theory of homicide." *Id.*

Despite Detective Meoni's admission that there was no concrete evidence, and

despite Ms. Deadmond's opinion that the evidence suggested that Ms. Jacobson died by

suicide, Judge Grant nonetheless determined that probable existed to proceed to trial on

first-degree murder charges. He explained that, "[h]aving reviewed this evidence and

reviewing my notes from the PH / PEPG hearing, I do not find that the evidence is of such

significance that I would not have bound over the case on the charge of Murder in the

First Degree." *Id.*

The Court will not second-guess either of Judge Grant's probable cause

determinations. In the context of an arrest warrant, the Tenth Circuit has said that a

neutral judge's "issuance of a warrant is 'the clearest indication that the officers acted in

an objectively reasonable manner or . . . in objective good faith.'" *Stonecipher*, 759 F.3d

at 1141 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (certain internal

quotations and citations omitted)). The same is true here. Judge Grant considered the

later-developed evidence that Plaintiff now argues vitiated probable cause and rejected the defense's argument that there was insufficient evidence to go to trial. What is more, the jury deliberated for two full days prior to finding him not guilty. ECF No. 111, ¶ 63. If there was no evidence at all that Plaintiff killed Ms. Jacobson, the Court struggles to see how the jury could deliberate for two full days. The Court, like Judge Grant, finds that there was probable cause to continue Plaintiff's prosecution.[6]

* * *

To sum up, even viewing the facts in light most favorable to Plaintiff, the Court finds that the undisputed material facts show that probable cause existed to proceed with Plaintiff's criminal prosecution. Because Plaintiff cannot satisfy the third element of his malicious-prosecution claims, Defendants are entitled to summary judgment.

### B.    Whether Defendants Acted with Malice

Even assuming that Plaintiff satisfied the probable-cause element, he cannot establish that Defendants acted with malice. "[M]alice is a distinct element" that Plaintiff must prove to prevail on his malicious-prosecution claims. *Moses-El v. City & Cnty. of Denver*, No. 20-1102, 2022 WL 1741944, at *8 n.15 (10th Cir. May 31, 2022) (unpublished) (citing *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258–59 (10th Cir. 2007)). Under federal law, defendants act with malice if they intentionally or recklessly abuse the legal process, and malice may be inferred if arguable probable cause does not exist. *See*

---

[6] The Court also will not fault Defendants for drawing reasonable inferences from circumstantial evidence in his state criminal prosecution. See ECF No. 137 at 10–13. The Colorado Supreme Court has said that "[p]robable cause may be based on circumstantial evidence, and the police are entitled to draw appropriate inferences from the circumstantial evidence, even though the evidence might also support other inferences." *People v. Schall*, 59 P.3d 848, 852 (Colo. 2002).

*Reeves v. Chafin*, 547 F. Supp. 3d 1056, 1079–80 (D.N.M. 2021) (citing *Mglej v. Gardner*, 974 F.3d 1151, 1171 (10th Cir. 2020), and *Stonecipher*, 759 F.3d at 1146). Under Colorado law, malice "is shown if the primary motive of the defendant was a motive other than a motive to bring to justice a person thought to have committed a crime." *Barton v. City & Cnty. of Denver*, 432 F. Supp. 2d 1178, 1194 (D. Colo. 2006) (citing *Suchey v. Stiles*, 394 P.2d 739, 741 (Colo.1964)), *aff'd*, No. 06-1536, 2007 WL 3104909 (10th Cir. Oct. 24, 2007).

Defendants argue that there is no evidence showing that Detectives Meoni or Sisneros intentionally or recklessly abused the legal process or acted with improper motive. ECF No. 111 at 20. They explain that neither Defendant knew either party involved. *Id.* Rather, they argue that this was a run-of-the-mill homicide investigation, with a clear suspect and theory. *Id.* Finally, and most critically, they argue that probable cause existed to bring charges against Plaintiff. *Id.*

Plaintiff argues that malice may be inferred from a lack of probable cause. ECF No. 130 at 21. And in the alternative, Plaintiff argues that "Defendants became aware of highly exculpatory evidence that they knew or recklessly disregarded vitiated probable cause but failed to put it in their reports and *failed to notify the prosecution* and other relevant parties of this evidence and/or they were recklessly indifferent to the need to collect available exculpatory evidence." *Id.* The Court is not persuaded by either argument.

The Court has already determined that probable cause existed at the time of Plaintiff's arrest and throughout his prosecution. Indeed, two Colorado state-court judges

determined three times that probable cause existed to bring charges against Plaintiff. ECF Nos. 111-30, 111-33, and 111-35. The third determination—one month before Plaintiff's criminal trial—expressly considered the purportedly exculpatory evidence and still found probable cause existed to proceed to trial. ECF No. 111-35.

Turning to Plaintiff's alternative argument, it is undisputed that Detective Meoni— the lead detective at the time—notified DA Cohen on October 19, 2019, that the DPD lacked any "concrete evidence" that Plaintiff shot Ms. Jacobson "other than his lies and weird behavior." ECF No. 130, ¶ 46. The email specifically addressed the blood and GSR test results that informed Ms. Deadmond's opinion. *Id.* Therefore, Plaintiff's suggestion that Defendants withheld evidence from the prosecution team is insincere at best. And, Plaintiff points to no authority that Defendants were obligated to bypass DA Cohen and communicate directly with Plaintiff's defense counsel.

Finally, the Court is persuaded by Defendants' argument that, although Detective Meoni conceded that there was no concrete evidence "that Kimball shot" Ms. Jacobson, that does not mean there was no evidence that Plaintiff committed homicide. ECF No. 137 at 6–7. Plaintiff said one thing to 911 and another thing to Detective Meoni at the station. ECF No. 111, ¶ 32 (citing Plaintiff's deposition testimony where he admitted that his statement to Detective Meoni several hours after Ms. Jacobson's death contained several inconsistencies compared to his 911 call, including how Ms. Jacobson was shot, his text messages about his suspicion that she was cheating, and the cellphone video he took about the gun's location and whether he moved it). Courts often find that "inconsistent stories" may be probative of guilt. *United States v. $252,300.00 in U.S.*

*Currency*, 484 F.3d 1271, 1274 (10th Cir. 2007) ("We conclude that the multiple changes in their stories are of significant probative value."); *People v. Davis*, No. 19CA2317, 2023 WL 12040901, at *5 (Colo. App. Nov. 16, 2023).

Even drawing all reasonable inferences in light most favorable to Plaintiff, the Court finds that no reasonable juror could conclude that Defendants acted maliciously. There is simply no evidence—beyond mere argument—to the contrary. Defendants are thus entitled to summary judgment on this ground as well.

### C.    Whether Defendants Caused Plaintiff's Continued Prosecution

Even assuming Plaintiff satisfied the two elements analyzed above, he cannot satisfy a third element: that Defendants caused Plaintiff's continued prosecution. In general, to prove causation on a malicious-prosecution claim, Plaintiff must establish that each Defendant initiated or was "instrumental" in initiating a formal criminal case against him. *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 563 (2024) ("[A] plaintiff in [§ 1983 malicious-prosecution suit] had to show that an official initiated a charge without probable cause."). Plaintiff argues that "Defendants knowingly or recklessly used false information or omitted material information [1] to institute and [2] continue legal process against Plaintiff and/or were were [sic] instrumental in his continued prosecution." ECF No. 130 at 13. In support, Plaintiff makes four arguments which he contends vitiated probable cause. First, he argues that

> Meoni intentionally withheld Deadmond's highly relevant opinion . . . despite knowing the importance of bloodstain evidence, given his contradictory testimony at the PH. Meoni also testified at the PH completely inconsistently with his belief there was no concrete evidence of homicide.

*Id.* at 13–14. He then contends that

> Meoni withheld information about the autopsy, information
> which the defense did not learn until after the PH. Both
> Defendants Meoni and Sisneros lied to Cohen, who then
> misrepresented to the defense, that autopsy and toxicology
> results were not completed before the PH.

*Id.* Next, he argues that

> [n]either Defendant requested a BPA or competent bloodstain
> documentation, despite both recognizing the importance of
> doing so. Meoni affirmatively blocked the collection of this
> evidence, conveying to Benik that Deadmond should not
> come to the scene and later telling her the same thing himself,
> and, Sisneros had no idea whether BPA had even been
> ordered so as to request it if it had not.

*Id.* Finally, he states that

> Defendants also made no attempt to access the exculpatory
> surveillance videos on Plaintiff's phone until after the PH.
> They both thus prevented known and possibly relevant,
> available, exculpatory information from being collected, and
> Meoni affirmatively concealed exculpatory evidence.

*Id.* The Court addresses each argument in turn.

    *i.*    *Ms. Deadmond's Opinion*

The Court is not convinced that Detective Meoni withheld Ms. Deadmond's opinion

until the end of June 2020. On October 18, 2019, Ms. Deadmond spoke with Detectives

Meoni and Denison about an "unrelated case." ECF No. 130-6 at 35:16–24. Then she

told them, "based on reviewing the clothing -- so Kimball's clothing, the crime scene

photographs, the crime scene video, and the measurements from the FARO, I do not

believe anyone other than Jacobson could have pulled the trigger based on that specific

information." *Id.* But at 5:48 p.m. on that same day, Detective Meoni told DA Cohen in an

email that "[DPD did not] have any concrete evidence that Kimball shot her, other than his lies [and] weird behavior." ECF No. 130-37. Although he did not mention Ms. Deadmond by name, that does not mean that he "intentionally withheld" the opinion. Moreover, even if he did withhold her opinion, it would not have vitiated probable cause as Plaintiff argues because Judge Grant expressly considered it at the sanctions hearing and still found probable cause existed.

    *ii.    The Autopsy Report*

    There is no evidence that Defendants lied to DA Cohen about the timing of the autopsy report, and the email Plaintiff cites does not prove this purported fact. *See* ECF No. 130-29 (email from Dr. Holmes to Defendants, nowhere stating that the autopsy report is complete). But even so, this argument fails for three reasons. First, Plaintiff's defense counsel raised this issue in his motion for sanctions, and at the hearing, Judge Grant still found probable cause. ECF Nos. 111-33, 111-34. Second, the autopsy report itself supports probable cause. That is because Dr. Holmes noted that she "strongly considered" homicide as a possibility considering the circumstances surrounding Ms. Jacobson's death. ECF No. 130-27 at 3. Because Dr. Holmes's report states that she believed more evidence supported homicide than suicide, not disclosing it sooner could not have caused Plaintiff's prosecution nor would it have vitiated probable cause. Third, even if Dr. Holmes did finalize the autopsy report on October 16, 2019, Detective Meoni emailed Dr. Holmes on December 23, 2019, stating, "I received your autopsy report on Michelle Jacobson *today*." ECF No. 130-32 (emphasis added). He went on to tell Dr. Holmes that he has since learned that Plaintiff took a video of Ms. Jacobson prior to calling

911 that shows the handgun in a different location than the body-worn camera footage because Plaintiff "moved the gun to her left knee area (but stated he did not move the gun)." *Id.* He closed by stating that, "I am providing the information so you can have all the details (so far) you need for your report." *Id.* Thus, this email strongly suggests that Detective Meoni did not think the autopsy report was final in October or November 2019.

    *iii.    The Blood Analysis*

The Court is likewise not persuaded that Defendants did not complete a blood analysis. Defendants argue that, although they did not ask for an onsite BPA, they asked an onsite crime lab technician to take photos for bloodstain documentation, including a FARO scan of the bedroom. And although the technician made several errors in his documentation, Ms. Deadmond testified that she could have performed a proper analysis had the documentation been error-free. ECF No. 111-19 at 50:20–23.[7] Plaintiff has provided no authority that Defendants were required to request an onsite BPA, nor has he provided authority that electing to have a technician photograph and scan the scene instead of requesting a BPA somehow shows a reckless disregard for the truth.

    *iv.    Surveillance Videos*

Finally, the Court is not at all persuaded that the surveillance videos on Plaintiff's phones are exculpatory. To the contrary, having reviewed them, they appear to support probable cause. One captures Plaintiff saying, "I'm pretty sure you spent the night drinking and fucking." Ex. E (Defendants' conventionally submitted material). In another Plaintiff is heard asking Ms. Jacobson, "Hey are your shoes with your panties?"  Ex. F (Defendants'

---

[7] Plaintiff does not argue that Defendants caused these technical errors.

conventionally submitted material). And another showed Plaintiff letting Ms. Jacobson inside the home minutes before her death, where Plaintiff slams the door with enough force that it bounces open. Ex. M (Defendants' conventionally submitted material). Finally, the video Plaintiff took with his phone of him "discovering" Ms. Jacobson's body after the gun discharged is, at the very least, odd and highly suspicious behavior.

\* \* \*

In sum, the Court finds that the undisputed material facts establish that Defendants did not cause Plaintiff's continued prosecution. The evidence—or points of argument— that Plaintiff cites is vastly different from the facts of *Pierce v. Gilchrist*, where a police forensic analyst "distort[ed] evidence to convince the prosecuting authorities to press charges." 359 F.3d 1279, 1293 (10th Cir. 2004). There is no evidence that Defendants distorted any evidence to convince DA Cohen to press charges. The opposite is true; less than a month after Ms. Jacobson died, Detective Meoni told DA Cohen that the DPD lacked concrete evidence that Plaintiff killed her other than his inconsistent statements and objectively suspicious behavior. ECF No. 130-37. At best, Plaintiff disagrees with Defendants' investigation skills and techniques.[8] Such disagreements are insufficient to

---

[8] The Court finds that Plaintiff has failed to produce any evidence that either Defendant caused Plaintiff's continued prosecution. The Court pauses here to note that case is even clearer for Detective Sisneros. *Shrum v. Cooke*, 60 F.4th 1304, 1312 (10th Cir. 2023) ("We have repeatedly emphasized the importance of connecting defendants to misconduct in pleadings: 'To recover damages from each of [multiple] Defendants under § 1983, [Plaintiff] had to show that such Defendant personally participated in the alleged constitutional violation.' *Vasquez v. Davis*, 882 F. 3d 1270, 1275 (10th Cir. 2018). Specificity is particularly important in a complaint alleging malicious prosecution."). Other than an unpersuasive argument that she should have gone over Detective Meoni's head and "requested a BPA or competent bloodstain documentation," and that Detective Sisneros "had no idea whether BPA had even been ordered," ECF No. 130 at 13–14, Plaintiff points to no alleged wrongdoing on her behalf. Plaintiff again provides no authority whatsoever that a homicide detective is required to order these tests, especially when the evidence in this case suggests that proper photographs and FARO scans could provide the same level of analysis. *See* ECF No. 130, ¶ 24 (Plaintiff admits that Ms. Deadmond reviewed significant evidence collected at the scene,

prove causation on a malicious-prosecution claim.[9] Finally, DA Cohen testified that he believed then and now that probable cause supported the criminal charges, and that he "ultimately [made] the decision of what charges [went] to trial." ECF No. 111, ¶ 59.

## V. CONCLUSION[10]

Consistent with the above analysis, the Court GRANTS Defendants' motion for summary judgment, ECF No. 111. The Clerk of Court is directed to close this case.

DATED this 17th day of April 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

---

"including the crime scene photos, autopsy photos captured by the crime scene unit, video of the crime scene, FARO scans, measurements, laboratory analysis conclusions, and crime scene unit reports . . . "); ECF No. 111-19 at 17:2–22, 50:8–23 (Ms. Deadmond testifying that she could not perform a full blood spatter analysis because of the quality of the photographs and the faulty FARO scans, which were taken by CSI Benik, not either Defendant).

[9] To the extent that Plaintiff's claims are predicated on—that is, rely on—Detective Meoni's purported inconsistent or "contradictory testimony" during Plaintiff's preliminary hearing on December 3, 2019, see ECF No. 130 at 13, such claims are not actionable. Rehberg v. Paulk, 566 U.S. 356, 369 (2012) (when police officers testify in a legal proceeding, they enjoy "absolute immunity from any § 1983 claim based on the witness' testimony"); San Agustin v. El Paso Cnty., No. 18-CV-02646-MEH, 2019 WL 4059167, at *18 (D. Colo. Aug. 28, 2019) (citing Tenth Circuit authority holding that, "when the act of testifying does not serve as the basis for the claim, immunity does not attach").

[10] Defendants also argue that they are entitled to qualified immunity on Plaintiff's federal malicious-prosecution claim. ECF No. 111 at 21–22. In response, Plaintiff argues that the Court should reject that argument because Defendants falsified and omitted evidence and knowingly or recklessly acted with disregard for the truth. ECF No. 130 at 22–23 (citing Sanchez v. Hartley, 810 F.3d 750, 759 (10th Cir. 2016)). With its findings above, the Court need not reach this issue. However, because the Court found that probable cause existed at the initiation of Plaintiff's criminal case and never dissipated, the Court would find that Defendants are entitled to qualified immunity on Plaintiff's federal malicious-prosecution claim. Bailey v. Twomey, 791 F. App'x 724, 734 (10th Cir. 2019) (affirming the district court's order dismissing malicious-prosecution claim on qualified-immunity grounds).